303 F.2d 380
 STATE OF WISCONSIN and Public Service Commission of Wisconsin, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Phillips Petroleum Company, Intervenor.
LONG ISLAND LIGHTING COMPANY et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Phillips Petroleum Company, Public Service Commission of the State of New York, Intervenors.
PEOPLE OF the STATE OF CALIFORNIA and Public Utilities Commission of the State of California, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Phillips Petroleum Company, Intervenor.
 No. 16175.
 No. 16177.
 No. 16180.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 12, 1961.
 Decided November 30, 1961.
 Certiorari Granted May 14, 1962.
 
 See 82 S.Ct. 1138.
 Mr. William E. Torkelson, Madison, Wis., for petitioners in No. 16175.
 Mr. J. David Mann, Jr., Washington, D. C., with whom Messrs. John E. Holtzinger, Jr., and William W. Ross, Washington, D. C., and David K. Kadane, Mineola, N. Y., were on the brief, for petitioners in No. 16177.
 Mr. William M. Bennett, San Francisco, Cal., for petitioners in No. 16180.
 Mr. Arthur H. Fribourg, Atty., F. P. C., with whom Mr. John C. Mason, Gen. Counsel, F. P. C., at the time the brief was filed, and now Deputy Gen. Counsel, and Mr. Howard E. Wahrenbrock, Sol., F. P. C., were on the brief, for respondent.
 Mr. Kenneth Heady, of the bar of the Supreme Court of Oklahoma, Bartlesville, Okl., pro hac vice, by special leave of court, with whom Messrs. Charles E. McGee and Lambert McAllister, Washington, D. C., were on the brief, for intervenor Phillips Petroleum Co.
 Messrs. Kent H. Brown and George H. Kenny, Albany, N. Y., and Mrs. Barbara M. Suchow, New York City, were on the brief for intervenor Public Service Commission of State of New York in No. 16177.
 Before PRETTYMAN, FAHY, and DANAHER, Circuit Judges.
 PRETTYMAN, Circuit Judge.
 
 
 1
 Some controversies concern major problems of general application. Others concern only a limited set of circumstances. The case at bar is of the former variety. The questions are posed by complicated procedural difficulties. They concern the procedures of the Federal Power Commission in dealing with the rates of natural gas producers.
 
 
 2
 The Phillips Petroleum Company is a producer of natural gas. It procures gas from several widely separated and widely differing areas. It explores for, develops, produces, purchases, gathers and processes gas and oil. It sells gas to pipeline companies[1] under contracts negotiated by it and these customers. The contracts differ in such terms as delivery conditions, water content, hydrocarbon content, place of delivery, pressure, and price.
 
 
 3
 Two sections of the Natural Gas Act[2] are involved. One (Section 4(e)) provides in essence, as to sales subjected to regulation by the Commission, that when a rate or an increased rate is filed the Commission may suspend it for five months, meantime setting it for hearing. When such a rate goes into effect after the period of suspension (the Commission not having concluded its consideration), the funds derived from the newly-filed rates may be impounded and, in so far as the Commission fails to approve them, may be refunded. The burden of proving in such a proceeding that an increased rate is "just and reasonable" rests upon the company. The other section of the statute (5(a)) provides in essence that either upon a complaint or upon its own motion the Commission may inquire into an existing rate. If that rate be found unlawful the Commission must determine what shall thereafter be deemed a just and reasonable rate. Its decision becomes effective from its date. No refund is involved.
 
 
 4
 In October, 1948, the Commission instituted a proceeding under Section 5(a), the latter of the above sections, concerning Phillips's rates. In that proceeding it decided it had no jurisdiction over the rates of producers of natural gas. This court reversed the Commission,[3] and the Supreme Court affirmed our decision.[4] The Commission reinstated its 5(a) proceeding.
 
 
 5
 Meantime and thereafter Phillips filed increased rates in respect to many of its contracts. The Commission suspended them and set them for hearing, under Section 4(e) of the statute, the first of the two sections above discussed. Many purchasers, many contracts, many rate schedules, and many filings were involved. Thus many 4(e) proceedings, under different docket numbers, were instituted. As time went on, Phillips filed further proposed increases in some of these same rates. In such event the earlier proposed rate would, if approved, cover a limited period, i. e., until the succeeding increase in that same contract rate was filed. A period thus limited is called a "locked-in period" in the jargon of the industry. These later increases were also suspended by the Commission. Thus many proceedings under Section 4(e) involving rates of Phillips became pending.
 
 
 6
 The Commission consolidated the 5(a) proceeding and twelve of the 4(e) proceedings for hearing. These twelve 4(e) proceedings involved an aggregate of about five and a half million dollars in proposed increased rates. The proposed rates ranged from 5½ cents per Mcf to 13½ cents per Mcf. The proceeding was long, detailed, and resulted in a voluminous record of testimony and exhibits. The Examiner rendered a long (174 printed pages), careful and complete initial decision. He approached the problem from the standpoint of cost-of-service[5] and rate base. Many perplexing problems were presented. He examined them all and decided them. Among them were different approaches to cost-of-service, the allocation of production costs, the allocation of exploration costs, the problem of natural gas liquids, the rate base, adjustment to the test year, the computation of the income tax component, the proper rate of return, working capital, allocations between jurisdictional and non-jurisdictional sales, field prices, a discussion of system-wide as compared with area rates. Upon all these the Examiner made detailed findings and conclusions, displaying commendable patience and grasp of the subject matter. He adopted a system-wide approach and found that Phillips's total jurisdictional cost of service, properly computed, was $57,280,218 for the test year,[6] or an average unit cost of 11.662 cents per Mcf. He recommended that Phillips be ordered to calculate a maximum rate for gas with certain described qualities at such level that, when applied to the sales volume for all jurisdictional contracts, adjusted for approved delivery condition differentials, would produce revenues roughly equal to the system-wide cost of service. He recommended that Phillips be ordered to file, with full explanations, a list of rates so calculated. These calculated rates would be subject to approval by the Commission. He recommended that the rates thus calculated and approved be applied in both the 4(e) and the 5(a) proceedings, i. e., to both suspended and future rates.
 
 
 7
 The Commission reversed the Examiner. Its decision and findings were also extended and exhaustive (82 printed pages, plus exhibits). One Commissioner dissented in respect to the computation of the cost of service; otherwise he concurred. Basically, the Commission concluded "beyond any doubt, that the traditional original cost, prudent investment rate base method of regulating utilities is not a sensible, or even a workable method of fixing the rates of independent producers of natural gas." It pointed out critical differences between pipeline operations and producer operations, quoting from opinions by Mr. Justice Harlan and Mr. Justice Jackson, and saying that in regulating producers it is faced with problems entirely different from those of an ordinary public utility. It pointed out that simply to allow producers a return on investment would penalize the efficient or fortunate and reward the inefficient or unfortunate. Only where a producer purchases a fully developed acreage at a fair price does his investment have a real relationship to his return. The producer who first takes the risk in an area and proves it productive pays less for his rights than those who come later. But he must invest his funds before he knows whether he will have anything to sell or not. Mr. Justice Jackson once wrote that "there is little more relation between the investment and the result than in a game of poker."
 
 
 8
 The Commission pointed out that a producer of natural gas also produces oil, the price of which is unregulated, makes sales (intrastate, etc.) not subject to Commission jurisdiction, and sells products also excluded. Thus "extremely difficult" problems of allocating costs are involved. It commented that none of the experts proposed allocations acceptable to other experts. "Ridiculous results will be reached among the great number of producers and owners of interests if costs should be the only basis for regulation." It referred to the fact that much of Phillips's gas is purchased from thousands of independent producers whose rates are under percentage-type casinghead contracts, dependent on Phillips's rates. The interests of the many royalty owners must also be considered. Another problem is the administrative burden of full cost rate cases for each of thousands of independent producers. Adherence to cost rate-base methods results in necessity for a full-scale company-wide cost study to determine the proper price in any one contract. At the time of this Commission decision 3372 independent producers had rates on file. Five hundred seventy producers were involved in 3278 proposed rate increases under suspension and awaiting hearing. Of eleven rate increase cases in which full hearings had been had and decisions rendered, ten showed the increases justified. A special problem prevented decision in the other. In the three 5(a) cases theretofore completed, the producers' prices were found justified. Rigid adherence to the rate-base method would in many cases price the producers' gas out of the market. "From the foregoing, it follows that effective regulation of the price of natural gas must be on some more manageable plan than the rate base method. Thus it is clear that the better method would be to establish fair prices for the gas itself and not for each individual producer."
 
 
 9
 Simultaneously with the foregoing opinion the Commission promulgated a "policy statement" setting forth rate guidance schedules for various producing areas. These schedules consisted of two rates prescribed for each of twenty-three producing areas throughout the country (except for two areas, for which only one rate was given). One rate was for initial service, i. e., new contracts, in the area. The other was for increases in rates, i. e., proposals for increases in existing contracts, in the area. For example, in the first area listed (Texas District No. 1) an initial service rate of 15.0 cents per Mcf was given and an increased rate level of 14.0 cents per Mcf. The Commission described its preparation of these schedules thus:
 
 
 10
 "In arriving at the price levels for the various areas set forth in the appendix to this statement, we have considered all of the relevant facts available to us. Such consideration included cost information from all decided and pending cases, existing and historical price structures, volumes of production, trends in production, price trends in the various areas over a number of years, trends in exploration and development, trends in demands, and the available markets for the gas. Of necessity, we have not set forth the adjustments to these prices which must be made to take into account every possible provision of every contract which may affect the actual price, such as Btu adjustments, conditions of delivery, etc. The relevance of such adjustments to the basic contract price and the appropriate established price standard must be considered as each filing is made."
 
 
 11
 The proposed use of this list was described by the Commission as follows:
 
 
 12
 "* * * These standards will serve as a guide to us and to interested parties in determining whether proposed initial rates should be certificated without a price condition and whether proposed rate changes should be accepted or suspended.
 
 
 13
 * * * * * *
 
 
 14
 "These price levels, as announced by Appendix A attached to this statement, are for the purpose of guidance and initial action by the Commission and their use will not deprive any party of substantive rights or fix the ultimate justness and reasonableness of any rate level."[7]
 
 
 15
 In its opinion the Commission said further: "This schedule of prices is only for guidance and does not constitute any determination of just and reasonable rates and will not foreclose any person from justifying a particular rate in any area." The schedule is of maximum acceptable rates for gas from a given area, as opposed to rates established for each rate filing by each producer after a full cost-rate base consideration of each rate so filed.
 
 
 16
 The Commission disposed of the consolidated cases before it in three parts. The first part consisted of the superseded rates of the prior periods ("locked-in" periods). The second consisted of the presently current rates and those to be in effect during the interim period from now until the newly proposed area-rate system is completely designed and put into effect. The third part consisted of rates for the future after the completion and inauguration of the area-rate system.
 
 
 17
 Before we consider these several dispositions in detail we must understand the problem with which the Commission was dealing. The rates proposed to be increased in these 4(e) proceedings are not the rates of utilities in the traditional sense, such as pipelines. The rates here involved are the charges made by companies which buy or produce a product, process it to suit the requirements of a customer, and sell it to that customer under a contract. The product is procured from many different places, from Texas to West Virginia, from Louisiana to Wyoming. In its raw state it is of many different contents. Different customers require different terms as to the physical qualities of the delivered article, points and terms of delivery, and other factors. Hundreds of producers, hundreds of contracts, and thousands of rate filings are involved.
 
 
 18
 When we use the terms "cost of service" or "rate base" in this context, we must be careful of the meaning we intend. There is a system-wide cost of service. This would be, as the words indicate, a computation for the entire Phillips system. But even so it would not be a computation for all Phillips operations, because the Company has many operations, such as those in petro-chemical fields, and sales of all sorts of petroleum products, and many sales not subject to federal regulation under present statutes. In fact the Company's gross income from sales of natural gas in 1955 was less than six per cent of its total gross income. So even a system-wide computation of cost of service for sales of natural gas subject to Commission regulation requires monumental allocations of many costs, such as exploration costs, taxes, administration expenses, purchases, extraction costs, sales of residue gas and liquids, and so on. Nevertheless such a computation was made. The Examiner and also the Commission determined and used a system-wide cost of service. As found by the Commission the system-wide cost of service for Phillips's sales of natural gas subject to Commission jurisdiction in the test year 1954 was $55,548,054, or 11.309 cents per Mcf. But even the figure thus carefully computed was subject to adjustment for purchased gas costs, gathering taxes, and royalties. The same observations apply to the rate base on a system-wide basis. One was determined by the Commission.
 
 
 19
 Then, theoretically at least, there is a cost of service for each contract, if not for each rate, and so for each 4(e) proceeding. But nobody, so far as we are advised, contends that any such computations could be made with any meaningful results by any known method. The results of any such effort would be pure guesswork, involving a vast multiplication of the arbitrary allocations which would have to be made.
 
 
 20
 The Examiner did not attempt to make any cost-of-service determination on individual contract, rate, or case basis. He determined a system-wide cost of service, which gave him a nationwide average unit cost of 11.662 cents per Mcf. He then proposed that "[b]ased on the system-wide cost of service herein approved, as set forth in Appendix Table 12 hereof, Phillips shall calculate the `maximum rate for 1,000-pound, sweet, dehydrated, and gathered gas,' at such level that its application to the sales volumes delivered in 1954 under each and every one of the 1954 jurisdictional contracts, as adjusted for the approved delivery condition rate differentials, will produce total revenues roughly equal to such system-wide cost of service." He proposed further that "Phillips shall file with the Commission a statement of such `maximum rate,' including a clear and detailed explanation as to the manner in which it was calculated, together with a list of calculated rates for all of its jurisdictional rate schedules then in effect." The Commission, as we have said, reversed the Examiner, treating the case, in effect, in three parts.
 
 
 21
 1. As to the first part of the problem, the 4(e) proceedings, dealing with suspended proposals now superseded, the Commission made system-wide conclusions as to jurisdictional sales and applied them to these cases. It found $45,568,291 of revenues against $55,548,054[8] cost of service. This showed a system-wide deficit of some $9,000,000 on jurisdictional sales of natural gas. The Commission noted that no evidence had been presented to show that the different rates in these different (4(e)) proceedings were unduly discriminatory or preferential, which notation, translated, means that any adjustment in these rates should be correspondingly proportionate in respect to each and all. The Commission applied the result of its system-wide calculations to each and all of the 4(e) proceedings and concluded that no refunds were due. Having thus ordered, it concluded ("terminated") the proceedings.
 
 
 22
 The Commission made no determination of the cost of service of each of these contract rates separately; it had no evidence before it upon which it could make such determinations, and it was of opinion that such computations would be unworkable and foolish under the circumstances.
 
 
 23
 In these 4(e) cases, as we have pointed out, the Commission was dealing with a locked-in period. The revenues derived from the rates at issue had been impounded. The only question of substance in respect to that period was whether refunds should be made. The Commission decided that question, flatly and directly. No other question remained in those cases for decision. They presented no questions as to rates to be charged. Each presented the question whether a refund was due that customer for that past period and, if so, how much. Having made three determinations — (1) that there was a deficit of some $9,000,000 a year in revenues against cost of service, (2) that the increases involved totaled about five and a half million dollars and so, if allowed in full, would not wipe out the operating deficit, and (3) that any adjustments should be proportionate to all contract rates — it concluded that no refund was due on any contract, i. e., in any 4(e) proceeding. Section 4(e) pertinently says that the Commission "may" order a refund of "the portion of such increased rates or charges by its decision found not justified." We cannot say that a deficit justifies or requires a refund or that the Commission was unlawfully arbitrary in reaching that result from the premises.
 
 
 24
 We think the Commission's course was reasonable and tenable. Surely, if only a single rate had been involved, and enough evidence were introduced to justify, under testing, a conclusion that the company was operating at a deficit under that rate, it would not be necessary that evidence be taken to establish the precise penny amount of the deficit in order to support a reasonable inference by the Commission that no refund was indicated. Of course, in the matter at bar a number of rates in separate cases were involved, but the principle of procedure and the scope of permissible inferences from basic facts are much the same as in the suggested illustration. We think the facts support the conclusion.
 
 
 25
 It is argued that the Commission did not declare the rates under consideration to be just and reasonable or the contrary; that, instead, it "terminated" the proceeding. The contention is that the Commission made no decision. We think the point is not well taken. The Commission did make a clear decision, after elaborate findings, upon the one substantive issue before it. It did say it "terminated" the proceedings, but it terminated them after deciding the basic and dispositive issue, and it entered an order on that decision. Its "termination" was much like that of a judge after he has rendered findings, conclusion and judgment.
 
 
 26
 Whether the Commission should have preceded its ultimate conclusion of no-refund with an intermediate conclusion of justness and reasonableness in the rates at issue, and whether it properly added the termination order to its decisive finding, seem to us to be immaterial queries. The important feature is that the Commission reached and decided the critical substantial issue, rationally and upon detailed findings of basic facts upon an ample record.
 
 
 27
 This is not a Minneapolis Gas[9] situation, in which the Commission did nothing but simply terminated the proceeding without passing upon any of the disputed issues before it.
 
 
 28
 2. The case yields to clearer treatment if we next consider the part of the Commission's treatment which is last in chronological order, that is, the determination of rates for the future. As to these rates the Commission embarked upon the formulation of a new method of fixing just and reasonable rates for producers. It inaugurated hearings for that purpose. We think we need not explore the possibilities of success in that venture, or stop here to describe the projected scheme previously outlined in this opinion. In general it is referred to as an area-price method; it aims to establish proper prices for the gas rather than for the seller thereof. The Congress has confided the regulation of the natural gas industry to the Commission, not to the courts. The Supreme Court has said several times that the Commission is not bound to any one method or to known methods. The regulation of gas producers is a new project. Obviously, as is cogently pointed out in this record, it presents new and complex facts and problems. It would be foolish for the courts to hold that the Commission is bound to apply to these new conditions the methods and measurements designed and used for other and different regulatory purposes. We think it is clear that the Commission had ample authority to embark upon an effort to design suitable new standards for use in the regulation of producers when it found that the tools at hand were not suited to this purpose. The Commission abandoned the pending 5(a) proceeding in which it had been endeavoring to establish rates for the future by methods it now deems inadequate. We see no reason why it should not have done so.
 
 
 29
 3. The difficult part of the case before us concerns the second, or middle, part of the Commission's disposition. This involves the rates for the period from 1959 until the new system — or a new system — is designed and established. This period will be long, estimates running from four to fourteen years. The rates during this period may, theoretically, be (1) rates in effect without increases having been proposed after January 1, 1959, (2) rates proposed to be increased since that date and suspended under Section 4(e), (3) rates for which increases may be proposed after the present time, (4) initial rates, i. e., rates under new contracts made after January 1, 1959.
 
 
 30
 To meet the need for interim regulation the Commission took several steps. It published the policy statement which we have described. That announcement contained several components. First, the Commission said that in determining its own sua sponte action in respect to rates (i. e., suspending proposed increases or inaugurating inquiries into existing rates) it would be guided by the guide rates. Second, it said that persons attacking rates (i. e., customers and consumers) would be required to present evidence as to the industry generally in the area concerned, as well as the traditional evidence relating to the individual producer involved. Third, it said that "[a]s experience and changing factors may indicate," it would change the areas designated and likewise change the guide prices. Fifth, it said it will use its guide rates in disposing of 4(e) (i. e., suspended proposed increases) proceedings arising upon increases proposed since January 1, 1959.
 
 
 31
 Refraining from exploring the various arguments, and argumentative trails, pointed out to us by the parties, we come directly to the crux of this problem. Has the Commission power under the Natural Gas Act to do what it did? Can it adopt upon the basis of its own expertise and its files, without a record made in the open in respect to the specific subject matter in issue, and without hearing, a set of guidelines by which it will be controlled in its regulatory functions during an interim period while it is attempting to perfect a suitable system for permanent regulation? We think it can.
 
 
 32
 In the first place, and throughout, we must remember that the Congress has power to direct the regulation of interstate commerce, and it has placed that regulatory power over natural gas in the Power Commission. We must remember that the problem at bar concerns a regulatory power. We are not considering adjudicatory, or quasi-judicial, power. It has long since been established that rate-making is a legislative function, and it is so defined in the Administrative Procedure Act.
 
 
 33
 Regulation poses many difficult problems. New regulation poses acutely difficult problems. Solutions oftentimes develop slowly. Many illustrations of that fact could be called to mind.
 
 
 34
 What power has the Commission in respect to interim regulation while the permanent structure is being designed and erected? Must it use means and methods long established for use in respect to other and different regulatory necessities? Or may it design from its own judgment and accumulated data a new method designed for the new problem? The differences between a public utility, such as a pipeline rendering a service by means of a fixed plant and operation, and a producer, who discovers or buys a product where, when and under such terms as he may, and sells that product under contracts negotiated on the open market, are too evident to justify elaboration. Whether the method thus designed and put into use by the Commission is good or bad is no part of our problem. Our inquiry is whether it was within the orbit of statutory authority and whether it was within constitutional limitations. We turn to those questions.
 
 
 35
 The Natural Gas Act is broad in its bestowal of power. It declares that all rates demanded by a company in connection with the sale of gas in interstate commerce for resale shall be just and reasonable. Section 4(a). A gas company files with the Commission schedules of its rates. Section 4(c). If a company proposes to increase a rate, it must file a new schedule. The Commission may then enter upon a hearing concerning the "lawfulness" of the proposed rate. Section 4(e). If the Commission, on its own motion or upon complaint, finds a rate unjust, unreasonable, unduly discriminatory or preferential, the Commission "shall" determine the just and reasonable rate. Section 5(a). Of course, constitutional restrictions apply; rates fixed by governmental authority cannot be confiscatory; all procedures must be by due process, that term conveying meanings differing according to the basic nature of the proceeding but always including that which is fair and decent according to the standards of our social order and time.
 
 
 36
 The statute contains no definition of a "just and reasonable" rate. It is established by tradition and by many court decisions that for a public utility, rendering service by use of fixed equipment, a just and reasonable rate is one which returns a fair profit upon the investment, or which supplies the utility with adequate revenues to command needed funds upon an economically reasonable basis. But what of a fair price for a commodity bought and sold by a merchandiser? Almost the whole of the economics of merchandising differs from the economics of public utility service. Are the just and reasonable prices of such a merchandiser limited to fair returns on his own investment and prices paid by him (and, if so, what investment and what prices), or are those prices reasonably measured by the fair prices for the product as measured by the open competitive market for the product, evaluated by Commission expertise and data on the whole of the market operation? Either criterion is a method of regulation. It seems to us that the choice must lie with the Commission.
 
 
 37
 Let us emphasize that we do not have before us at this time the question whether any rate set by the Commission as a guide rate falls within the area of reasonable computation. That question is emphatically left open by the Commission, and by us, for consideration when some one or more of the selected guide rates is attacked, by a producer, a customer, or a consumer. The problem here at this time is merely whether the Commission may embark upon this method of regulation. Since it is the Commission's judgment that this method is best suited for the regulation of these prices, for the determination of their justness and reasonableness, we find in the statute nothing to deny a trial of the method.
 
 
 38
 Of course, conceivably, justness and reasonableness from the standpoint of the consumer might be defined as limiting the vendor's return to a fair amount on his investment, and his price accordingly. But, if the government agency charged with the responsibility in the public interest finds, after elaborate accumulation of data, that such a measurement is unworkable, may not a fair price for the product reflected on the open market, after scrutiny and adjustment by the government agency concerning the factors which produced that price, be just and reasonable for the consumer? Of course the agency would be required to be alert for artificial impulses in such a fair area price, and the avenues of attack by consumers would have to be kept open without obstruction; but, if the latter is avowed, how could we assume in advance that the agency would not protect the consumer as it is charged by the Congress to do? The Commission is not here proposing to accept a field price, or any other price as is. It has announced guideline rates which it deems to be, on the basis of the internal data in its files on all the operators in the several areas, fair rates for the product in those areas. Such rates, thus determined, would seem to be just and reasonable rates for the consumers of the product. And, similarly, they would seem to be just and reasonable charges for the producers to make.
 
 
 39
 As to the constitutional question of confiscation, it would seem to us that the question should await the proof presented by a producer in respect to a particular rate in a particular area.
 
 
 40
 Thus we come to conclude that the interim method of regulation proposed by the Commission does not appear at this point in the process to be violative of either statutory or constitutional limitations.
 
 
 41
 It is urged upon us that the Commission has abandoned regulation of these rates for this interim period. We do not agree with that view. It has certainly changed the method of regulation, or, more precisely, the standards by which it will apply its regulatory power. It has abandoned case-by-case, contract-by-contract measurements on a cost-of-service rate-base basis. It has installed an area fair price measurement for the prices of the product to be sold. In so doing it has abandoned a method it finds to be unworkable and foolish in favor of a method it deems to be workable and just and reasonable. If that be so, instead of abandoning regulation it is making regulation effective. The choice it faced, at least in its own view, was not between regulation or no regulation but was between effective and ineffective regulation.
 
 
 42
 If, as some consumer interests fear, the new process turns out to be ineffective in the protection of their interests, the way is open for them to challenge the results; as we have pointed out, that way must be kept open. New rates and increases in rates proposed during this interim will be subject to suspension and refund, and so the rights of customers will be fully protected. The new method will also apply in 5(a) proceedings to any existing rate found to be unjust or unreasonable. Refunds cannot be ordered in the latter cases and so consumers bear the disputed rates during the period of the inquiry. But this same situation obtains in the present process of regulation; the application of the new criteria makes no change in this procedural aspect. In the case at bar the Commission has found, after elaborate consideration, that present rates result in deficits to the Company. Consumers have no tenable ground for complaint of such rates. So it seems to us that the interests of consumers are amply protected during this interim period; at least a contrary effect should await the event for us to disturb the view of the Commission, based as it is upon this record.
 
 
 43
 There remains for discussion a point concerning two 4(e) proceedings which were not terminated. They involved proposed increases based upon escalator clauses in two of Phillips's contracts. These contracts were made before producers such as Phillips were subject to regulation. They were with pipeline companies, as customers, which were subject to regulation. The contracts provided that, if the pipeline companies were granted increases in the rates they could charge, Phillips in turn would receive increases in the rates it charged these customers. These customers had proposed increases, and they were pending in 4(e) proceedings. The Commission ordered that upon decisions in the customers' rate cases Phillips's cases would be acted upon.
 
 
 44
 Wisconsin and California contend that the Commission should now declare these escalator clauses to be illegal and void as against public policy. As a matter of fact the Commission has declared these clauses to be against the public interest and that they should be held inoperative. But, the Commission says, in so far as these cases of Phillips are concerned, action of the sort demanded by Wisconsin and California is premature. Action on these clauses, it says, should await action on the pending cases which in orderly processes present the problem for decision. We agree with the Commission.
 
 
 45
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 It also sells oil, products condensed from gas, and other petroleum products and chemicals. It sells natural gas in several conditions. It sells to customers other than pipelines as well
 
 
 [2]
 52 Stat. 821 (1938), as amended, 15 U.S.C.A. §§ 717-717w
 
 
 [3]
 State of Wisconsin v. Federal Power Comm'n, 92 U.S.App.D.C. 284, 205 F.2d 706 (1953)
 
 
 [4]
 Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954)
 
 
 [5]
 Cost-of-service in this context includes not only operating expenses, taxes, exploration allowances, and gas purchases but also a fair return on the rate base
 
 
 [6]
 Compared with 92.3 million dollars claimed by Phillips
 
 
 [7]
 Statement of General Policy No. 61-1, Sept. 28, 1960, 25 Fed.Reg. 9578 (Oct. 5, 1960)
 
 
 [8]
 Modified to $54,525,315 after rehearing
 
 
 [9]
 Minneapolis Gas Company v. Federal Power Commission, 111 U.S.App.D.C. 16, 294 F.2d 212 (1961)
 
 
 
 46
 FAHY, Circuit Judge (dissenting, with partial concurrence).
 
 
 47
 I am not able to agree that the order of the Commission terminating the section 4(e)[1] and section 5(a)[2] proceedings should be affirmed. I think the cases should be remanded to the Commission for decision.
 
 
 48
 While the Commission advances strong reasons for abandoning cost of service as a method of determining the justness and reasonableness of the rates of independent producers of gas, a careful reading of the Commission's opinion demonstrates that the Commission's conclusion that such a method is unworkable follows from a generalized view of the problem of producer rates rather than from the inability of the Commission to utilize the cost of service method in these Phillips cases.
 
 
 49
 Embarkation upon the area method preferred by the Commission does not necessitate judicial intervention, certainly not at this time; for judicial review must await a Commission order based upon that method. We should not seek to deter the Commission from pursuing such a method in future proceedings, or from using it in any proceedings already initiated along those lines. But it does not follow in my opinion that the Commission should be affirmed in failing to decide the present cases, though it may need to update the record. In the same breath as it were in which it describes the unworkability of the cost of service method the Commission itself accepts that precise method in finding that no refunds are to be required in the section 4(e) proceedings, stating:
 
 
 50
 "While we have found that the rate base method is not an effective means of regulating the producers' prices, evidence in this proceeding was presented almost entirely upon the cost basis and, of course, there were no ceiling prices issued by us at the time of the hearing. There was some field price evidence introduced, but if field prices could be employed in arriving at rates for Phillips, the evidence was incomplete and unrepresentative of Phillips' diverse sales. Therefore we shall proceed on the basis of the evidence adduced in this case to reach conclusions, as reasonable, intelligent and logical as possible even though we know and have herein stated the difficulties inherent in determining a cost of service for Phillips using the rate method. This is clearly a lawful way to determine rates for Phillips as illustrated by the City of Detroit case,[11] and under the present record is the only possible method, and therefore we shall make every effort to reach a result by this means."
 
 
 51
 11. City of Detroit v. F. P. C., (CADC), 230 F.2d 810, certiorari denied, 352 U.S. 829.
 
 
 52
 The Commission could as well have proceeded, with supplemental data, to decide the question of justness and reasonableness of the rates in the section 4(e) proceedings, and, also, to have determined under section 5(a) the just and reasonable rates to be thereafter observed and enforced.
 
 
 53
 This view is strongly fortified by the able decision of the Presiding Examiner. After an illuminating analysis of the voluminous record made on a cost of service basis he was able to propose definitive decisions. The record had been made with the cooperation of all parties, Phillips itself affirmatively acquiescing in the position that cost of service was the appropriate basis on which to proceed. Phillips' position, as the Examiner points out, was that its jurisdictional rates should be determined upon the basis of an overall cost of service.
 
 
 54
 It is one thing to say, as the Commission does, that the area method should hereafter be adopted, or even adopted in other cases which have not proceeded as far as those before us. It is quite another thing to say that the latter should not be decided under the standards of the Act because the area method was not used in preparing the record. Unless decided Phillips' challenged rates are left undetermined under the standards of the Act since 1948, and apparently will continue to remain undetermined until some future day when new proceedings, now in an inchoate status with no end in sight, are concluded. Difficult and complicated as the tasks of the Commission admittedly are I cannot agree after reading the Examiner's decision or the Commission's findings that the congressional mandate of section 4(e), which requires that these matters shall be decided "as speedily as possible," is being complied with, or that the responsibilities of the Commission under the Act are discharged in the situation resulting from the termination order.
 
 
 55
 These cases need not be treated as if they were ventures initiated in search of an ideal method of regulating the rates of independent gas producers. Having in mind the history of these proceedings, and the primary congressional purpose of consumer protection, it seems to me that decisions on the present record, supplemented as may be found to be reasonably necessary, would be far more likely to approximate fulfillment of the purposes of the Act than are the termination order and the resulting situation.
 
 
 56
 The Commission says it has a discretion to terminate as well as to initiate; but once it has exercised its discretion to initiate and has pursued the matter to the extent we find here its discretion to terminate is not as broad as was its discretion to initiate. The former becomes limited by the conditions existing at the time of its exercise. Minneapolis Gas Co. v. Federal Power Comm., 111 U.S. App.D.C. 16, 294 F.2d 212. Compare, Eastern Air Lines, Inc. v. Civil Aeronautics Board, 111 U.S.App.D.C. 39, 294 F.2d 235.
 
 
 57
 The Commission has actually found Phillips' cost of service on the basis of the record made and has arrived on the same record at a proper rate of return, stating "this is clearly a lawful way to determine rates for Phillips as illustrated by the City of Detroit case, * * * and under the present record is the only possible method * * *." In this manner the Commission has come so close to doing what it says it should not do as to demonstrate that it is able to do what it has failed to do.
 
 
 58
 The finding of the Commission in the section 4(e) proceedings that there could be no refunds because the cost of service exceeded the revenues on the basis of the data for the 1954 test year, I think does not justify the order terminating all but two of the section 4(e) proceedings, or the Commission's invitation to Phillips to move to terminate all others which are still pending. The absence of a decision on the issue of justness and reasonableness of rates has the effect of leaving all rates subsequent to 1954 untested under the standards of the Act. Substance is not achieved merely by finding whether or not refunds were due on the basis of the 1954 data. A finding in that regard should not be independent of a finding of the just and reasonable rates. The former should follow from the fact that the just and reasonable rates are not exceeded by those in effect.
 
 
 59
 The decision of these cases under the standards of the Act not only would not preclude the Commission from embarking upon the area method, but it also would not preclude the Commission from correcting or modifying the decision should the area proceeding show such correction or modification to be desirable; nor do I think a decision on the present record, supplemented as may be needed, would preclude the Commission, pending conclusion of an area proceeding, from establishing guides, formulated, however, with the aid of a decision in the present proceedings.
 
 
 60
 I agree with Judge Prettyman as to the prematurity of the request for action on two section 4(e) proceedings which have not been terminated.
 
 
 
 Notes:
 
 
 [1]
 52 Stat. 822 (1938), 15 U.S.C. § 717c, 15 U.S.C.A. § 717c (1958)
 
 
 [2]
 52 Stat. 823 (1938), 15 U.S.C. § 717d, 15 U.S.C.A. § 717d (1958)