227 U.S. 88 (1913)
INTERSTATE COMMERCE COMMISSION
v.
LOUISVILLE AND NASHVILLE RAILROAD COMPANY.
No. 600.
Supreme Court of United States.
Argued October 17, 18, 1912.
Decided January 20, 1913.
APPEAL FROM THE UNITED STATES COMMERCE COURT.
*89 Mr. Assistant Attorney General Fowler and Mr. P.J. Farrell, with whom Mr. Blackburn Esterline, Special Assistant to the Attorney General, was on the brief, for appellants.
Mr. Helm Bruce, with whom Mr. Henry L. Stone and Mr. Albert S. Brandeis were on the brief, for appellee.
MR. JUSTICE LAMAR delivered the opinion of the court.
The New Orleans Board of Trade, in October and November, 1907, brought three separate proceedings against *90 the Louisville & Nashville Railroad, asking the Commerce Commission to set aside as unfair, unreasonable and discriminatory certain class and commodity rates (local) from New Orleans to (1) Mobile, to (2) Pensacola, and (3) through rates, via those cities, to Montgomery, Selma, and Prattville. The Railroad answered. A hearing was had, the issue as to commodity rates was adjusted by agreement, and on December 31, 1909, the Commission made a single order in which it found the class rates complained of to be unreasonable, directed the old locals to be restored and a corresponding reduction made in the through rates. The Railroad thereupon, on January 26, 1910, filed a bill, in the United States Circuit Court for the Western District of Kentucky, praying that the Commission be enjoined from enforcing this order, which it alleged was arbitrary, oppressive and confiscatory, and deprived the company of its property and right to make rates, without due process of law.
After a hearing before three Circuit Court judges, the carrier's application for a temporary injunction was denied (184 Fed. Rep. 118). Testimony was then taken before an Examiner. Later the suit was transferred to the newly organized Commerce Court  the United States being made a party. There, in addition to the evidence in the Circuit Court, the Railroad exhibited all that had been introduced before the Commission, as a basis for the contention that this evidence utterly failed to show that the rates attacked were unreasonable. This view was sustained by the Commerce Court, which, in a lengthy opinion, held (one judge dissenting) that the order was void because there was no material evidence to support it.
On the appeal here, the Government insisted that while the act of 1887 to regulate commerce (24 Stat. 379, c. 104, §§ 14, 15, 16) made the orders of the Commission only prima facie correct, a different result followed from the provision in the Hepburn Act of 1906 (34 Stat. 584, c. 3591, *91 § 15) that rates should be set aside if after a hearing the "Commission shall be of the opinion that the charge was unreasonable." In such case it insisted that the order based on such opinion is conclusive, and (though Int. Com. Comm. v. Union Pacific R.R., 222 U.S. 541, 547, was to the contrary) could not be set aside, even if the finding was wholly without substantial evidence to support it.
1. But the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. A finding without evidence is arbitrary and baseless. And if the Government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our Government. It would mean that where rights depended upon facts, the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however beneficently exercised in one case, could be injuriously exerted in another; is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power.
In the comparatively few cases in which such questions have arisen it has been distinctly recognized that administrative orders, quasi-judicial in character, are void if a hearing was denied; if that granted was inadequate or manifestly unfair; if the finding was contrary to the "indisputable character of the evidence." Tang Tun v. Edsell, 223 U.S. 673, 681; Chin Yoh v. United States, 208 U.S. 8, 13; Low Wah Suey v. Backus, 225 U.S. 460, 468; Zakonaite v. Wolf, 226 U.S. 272; or, if the facts found do not, as a matter of law, support the order made. United States v. B. & O.S.W.R.R., 226 U.S. 14. Cf. Atlantic C.L. v. North Carolina Corp. Com., 206 U.S. 1, 20; Wisconsin, M. & P.R. Co. v. Jacobson, 179 U.S. 287, 301; *92 Oregon Railroad v. Fairchild, 224 U.S. 510; I.C.C. v. Illinois Central, 215 U.S. 452, 470; Southern Pacific Co. v. Interstate Com. Comm., 219 U.S. 433; Muser v. Magone, 155 U.S. 240, 247.
2. The Government's claim is not only opposed to the ruling in I.C.C. v. Union Pacific, 222 U.S. 541, 547, and the cases there cited, but is contrary to the terms of the Act to Regulate Commerce, which, in its present form, provides (25 Stat. 861, § 17) for methods of procedure before the Commission that "conduce to justice." The statute, instead of making its orders conclusive against a direct attack, expressly declares that "they may be suspended or set aside by a court of competent jurisdiction." 36 Stat. 539 (15). Of course, that can only be done in cases presenting a justiciable question. But whether the order deprives the carrier of a constitutional or statutory right; whether the hearing was adequate and fair, or whether, for any reason, the order is contrary to law  are all matters within the scope of judicial power.
3. Under the statute the carrier retains the primary right to make rates, but if, after hearing, they are shown to be unreasonable, the Commission may set them aside and require the substitution of just for unjust charges. The Commission's right to act depends upon the existence of this fact, and if there was no evidence to show that the rates were unreasonable, there was no jurisdiction to make the order. Int. Com. Comm. v. Northern Pacific Ry., 216 U.S. 538, 544. In a case like the present the courts will not review the Commission's conclusions of fact (Int. Com. Comm. v. Delaware &c. Ry., 220 U.S. 235, 251), by passing upon the credibility of witnesses, or conflicts in the testimony. But the legal effect of evidence is a question of law. A finding without evidence is beyond the power of the Commission. An order based thereon is contrary to law and must, in the language of the statute, "be set aside by a court of competent jurisdiction." 36 Stat. 551.
*93 4. The Government further insists that the Commerce Act (36 Stat. 743) requires the Commission to obtain information necessary to enable it to perform the duties and carry out the objects for which it was created, and having been given legislative power to make rates it can act, as could Congress, on such information, and therefore its findings must be presumed to have been supported by such information, even though not formally proved at the hearing. But such a construction would nullify the right to a hearing,  for manifestly there is no hearing when the party does not know what evidence is offered or considered and is not given an opportunity to test, explain, or refute. The information gathered under the provisions of § 12 may be used as basis for instituting prosecutions for violations of the law, and for many other purposes, but is not available, as such, in cases where the party is entitled to a hearing. The Commission is an administrative body and, even where it acts in a quasi-judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. Int. Com. Comm. v. Baird, 194 U.S. 25. But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the Commissioners cannot act upon their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown but *94 presumptively sufficient information to support the finding. United States v. Baltimore & Ohio S.W.R.R., 226 U.S. 14.
As these contentions of the Government must be overruled, it is necessary to examine the record with a view of determining whether there was substantial evidence to support the order.
5. The Louisville & Nashville Railroad ran from New Orleans to Mobile and to Pensacola. From both of these cities it also had lines extending to Montgomery. When the road from Mobile to New Orleans was completed about 1871 there was in operation a boat line carrying freight from the latter city to Mobile and Pensacola. In order to meet this water competition a low rail rate was compelled and was put in force by the rail carrier.
In 1887 the through rate from New Orleans to Montgomery was adjusted so as to conform to an award by Judge Cooley, under which, rates from certain Ohio River points to Montgomery were to be the same, irrespective of any difference in distance. Rates to Montgomery from Kentucky points on the Mississippi were to be two cents lower, and rates to Montgomery from Memphis, Vicksburg and New Orleans were to be two cents lower still. With the exception of a change made necessary by the construction of a short line from Memphis to Birmingham, the class rates in that territory were, as a rule, maintained in conformity with the Cooley award, though, from time to time, commodity rates were made to meet special conditions.
Changes in rates from New Orleans to Mobile, to Pensacola, and from those cities to Montgomery were made in 1907. The carrier insists that the situation at Pensacola was not the same as at Mobile. But the controlling principle is applicable to the rates at all the points involved. And in order to prevent a treble discussion of the three cases the rates from New Orleans to Mobile to Montgomery *95 may be regarded as typical. The increase in Class rates varied from 1 to 13 cents per 100 pounds. The increase in Class 3 was greatest, and it will therefore be taken as affording the best concrete example of the situation before and after the change of 1907.
Under the Cooley award the Tariff on Class 3 had been fixed as follows:

 New Orleans to Mobile (local) ......... 25
 Mobile to Montgomery (local) .......... 30
 __
 Combination of locals ................. 55

But while these locals aggregated only 55 cents, there was, at the same time, a through rate:

 New Orleans to Montgomery ............. 68

The carrier's filed tariffs contained a provision that wherever the rates between two points, on its line, was greater than the sum of the locals between the same places the combination of the two locals should be collected. There was nothing to indicate that shipments from New Orleans to Montgomery were not entitled to this Combination rate; but it seems that the privilege was rarely, if ever, granted to New Orleans merchants who, in order to get the advantage of the low locals (25), were obliged to ship to Mobile, there unload, reload and rebill to Montgomery at the 30 cent rate. By this inconvenient method they could secure the 55-cent rate to Montgomery. Otherwise, they paid the rate of 68 cents on the same goods over the same line between the same points.
The carrier was notified that this practice was in violation of the Commission's ruling that, except in special cases, the through rate must not exceed the sum of the locals. An enforcement of this rule would have compelled the carrier to reduce the through rate (68) to the sum of the locals (55), and so, in less proportion, as to all other class rates involved in this case.
*96 The company, however, met the situation by increasing the local, instead of reducing the through rate. For example, the rate on Class 3 from New Orleans to Mobile was raised from 25 to 38, so that, when added to the 30 cent rate from Mobile to Montgomery the Combination 68 equalled the existing through rate of 68 cents from New Orleans to Montgomery. Similar action was taken as to all other rates between New Orleans and Mobile and New Orleans and Pensacola and thence to Montgomery.
At the hearing the facts thus recited were established. The reports of the carrier, showing its earnings and expenses in detail, were in evidence. Its tariffs and those of other railroads were offered, as a basis for comparing the rates under attack with those charged by this and other companies for similar and longer distances. Numerous merchants from New Orleans testified that since the increase of August 13, 1907, they had been unable to sell in Mobile and Pensacola and that the through rate to Montgomery made it impossible to deal in that city. In its report the Commission found that the rates to Mobile, Pensacola and Montgomery from other and more distant points were actually or relatively higher than those for the shorter distance from New Orleans. That the ton-mile rate on the average of the first six classes was greater from New Orleans to Montgomery than from Memphis; that many departures had been made from the Cooley award; that the company's tariff contained a provision that the through rates should not exceed the sum of the locals; that while increasing the local on eastbound freight from New Orleans to Mobile and Pensacola no corresponding increase had been made on the westbound freight from those points to New Orleans; that the old low local out of New Orleans had been so long in force as to create a presumption that it was reasonable and compensatory. It concluded by entering an order adjudging that the rates in the tariff filed August 13, 1907, were unreasonable and *97 directing the carrier to restore the old class rates (local) from New Orleans to Mobile and to Pensacola and to make a corresponding reduction in the through rates from New Orleans to Montgomery, Selma and Prattville.
This order was attacked generally and specially by a bill, which, at length and in minute detail, assailed each specific fact stated in the report on the ground, either that the fact found was without evidence to support it, or that it was irrelevant to the issue involved and furnished no basis whatever for the order which followed.
The Commerce Court rendered a lengthy and elaborate opinion in which it reviewed all of the matters referred to in the Commission's Report and held that the findings were irrelevant, or without evidence to support them, or contrary to the uncontradicted testimony; that the fact that rates from more distant points to Montgomery, Pensacola and Mobile were actually or relatively lower than from New Orleans to the same points, furnished no basis for the order, unless it was shown that the conditions were similar while it affirmatively appeared that these lower rates were compelled by water competition; that no conclusion could be drawn from the fact that such rates to Montgomery from other points were lower on the ton-mile basis, in view of the universal rule that the longer the haul the lower the rate. That the departures from the Cooley award related only to commodity rates, which were not involved in this hearing, and that the complaints of the merchants as to inability to sell in Mobile, Pensacola and Montgomery were referable only to Commodity rates and not to Class rates. It found that no legal inference could be drawn from the fact that the low locals had been maintained on westbound shipments after the carrier, on August 13, 1907, raised the locals on eastbound shipments from New Orleans to Mobile and Pensacola, inasmuch as there is no legal objection to having lower rates in one direction than in another. It found that the sole ground *98 for making the order was the fact that the carrier had raised rates after they had been in force for more than twenty years; although the presumption of reasonableness disappeared in view of the uncontradicted testimony that the old rates had been compelled by water competition.
6. It is unnecessary in this case to review each of the matters discussed, ruled and found by the Commission in its Report and only the more salient facts will be mentioned. For the validity of the order does not necessarily depend upon the correctness of each of these findings, so that the breaking of one or many links by disproof would destroy the chain upon which the order depended. These findings are collateral and if correct might be confirmatory of the ruling, which, however, might still be sustained if some of these statements were eliminated. The question is whether there was substantial evidence to support the order.
7. The pleadings charged that the new rates were unjust in themselves and by comparison with others. This was denied by the carrier. The Commission considered evidence and made findings relating to rates which the carrier insists had been compelled by competition, and were not a proper standard by which to measure those here involved. The value of such evidence necessarily varies according to circumstances, but the weight to be given it is peculiarly for the body experienced in such matters and familiar with the complexities, intricacies and history of ratemaking in each section of the country. So, too, the fact that a Commodity rate is low may cast some light on the reasonableness of the higher rate on the Class, from which that Commodity was taken or to which it might legally be restored.
It is true that the old low locals, Mobile (west) to New Orleans were maintained, while those from New Orleans (east) to Mobile were raised is not conclusive against the reasonableness of new tariff put in force in 1907. But it *99 was a fact tending to support the conclusion unless the difference was shown to have been warranted by proper rate-making rules. Of the sufficiency of the explanation, including the extent of the difference in empty car movement, the Commission was authorized to judge. It also had before it the company's financial statement and general tariff sheets. Against which was the testimony for the carrier, tending to prove that the rate to New Orleans was low in fact, and by comparison with those in force over other parts of the carrier's system, and on other lines in the same territory, even though this particular part of the road ran through a sparsely settled country, with expensive trestles and bridges, frequently damaged by storms from the Gulf and expensive to maintain.
8. But these facts did not stand alone. It appeared that for many years prior to 1907 the carrier had maintained low locals from New Orleans to Mobile and Pensacola. When first put in force they were abnormally low because compelled by water competition, and therefore furnish no just standard of reasonableness. And if when that competition disappeared the rates had been advanced, no inference adverse to the railroad could have been drawn from the increase. Int. Com. Comm. v. Chicago G.W. Ry., 209 U.S. 108. The answer of the Railroad Company admits that this water competition had ceased to exist. The date is not definitely stated, but it is fairly inferable that the water competition was not potential for some years before the increase in rates in 1907. When made, the increase was not because of the absence of water competition, but to make the sum of the locals correspond with the through rates. Under the circumstances the maintenance of these low rates, after the water competition disappeared, tends to support the theory that by an increase of business or other cause they had become reasonable and compensatory.
9. From the appellee's standpoint, probably a principal *100 objection to the order complained of, is that it will upset the Cooley award, under which rates have been adjusted throughout a large section. But that, too, was a matter for consideration by the Commission which by this order has not lost power to restore the old rates, or to make changes in the new if it shall be found that those put in force, unjustly discriminate in favor of New Orleans against other cities.
The order of the Commission, restoring a local rate that had been in force for many years, and making a corresponding reduction in the through rate, was not arbitrary but sustained by substantial, though conflicting evidence. The courts cannot settle the conflict nor put their judgment against that of the rate-making body, and the decree is
Reversed.