PHILLIPS PETROLEUM COMPANY, a Delaware corporation, et al., Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

The State of New Mexico, Intervenors.

Nos. 71–1659, 71–1739, 72–1134 and 72–1167.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 12, 1972.

Decided Feb. 20, 1973.

Rehearing Denied April 10, 1973.

Edwin S. Nail, Tulsa, Okl., and Kirk W. Weinert, Houston, Tex. (Kenneth Heady and John L. Williford, Bartlesville, Okl., on brief for Phillips Petroleum Co.; Edwin S. Nail, Tulsa, Okl., on brief for Amerada Hess Corp.; Edward J. Kremer, Jr., Dallas, Tex., and Charles E. McGee, of McGee & Ketcham, Washington, D. C., on brief for Atlantic Richfield Co.; Lynn R. Coleman, J. Evans Attwell, and Vinson, Elkins, Searls & Smith, Houston, Tex., on brief for Belco Petroleum Corp. and High Crest Oils, Inc.; Cecil E. Munn, of Cantey, Hanger, Johnson, Scarborough & Gooch, Fort Worth, Tex., on brief for Beta Development Co.; Justin R. Wolf, Wolf & Case, Washington, D. C., on brief for Chevron Oil Co., Western Division; Thomas H. Burton, Houston, Tex., on brief for Continental Oil Co.; Warren M. Sparks and B. James McGraw, Tulsa, Okl., on brief for Gulf Oil Corp.; Martin N. Erck, Kirby Ellis and John R. Rebman, Houston, Tex., for Humble Oil & Refining Co.; William A. Sackmann, Findlay, Ohio, for Marathon Oil Co.; Ronald J. Jacobs, Tulsa, Okl., for Skelly Oil Co.; Stanley M. Morley, of Shannon & Morley, Washington, D. C., on brief for Sun Oil Co.; John E. Watson, Houston, Tex., on brief for Tenneco Oil Co.; J. Donald Annett, Washington, D. C., Kirk W. Weinert, John M. Young, C. Fielding Early, Jr., Houston, Tex., for Texaco Inc.; Douglas C. Gregg, George C. Bond, Robert L. Humphrey, Dee Hughes Richardson, Los Angeles, Cal., on brief for Union Oil Co. of California), for petitioners.

Gordon Gooch, General Counsel (Leo E. Forquer, Solicitor; J. Richard Tiano, Deputy Solicitor; Joan E. Heimbigner, Atty., Federal Power Commission, Washington, D. C., on brief), for respondent.

David L. Norvell, Atty. Gen. of New Mexico, on brief for State of New Mexico.

Joel B. Burr, Jr., and William J. Cooley, Farmington, N. M., on brief for Four Corners Gas Producers Assn.

844

Tilford Jones, Bethesda, Md., for United Distribution Co.

Donald S. Graham, of Davis, Graham & Stubbs, Denver, Colo., and G. Scott Cuming, El Paso, Tex., for El Paso Natural Gas Co.

William G. Webb, of Turner, Hitchins, McInerney, Webb & Hartnett, Dallas, Tex., for Pubco Petroleum Corp.

Norman J. Provost, K. R. Edsall, and W. H. Owens, Los Angeles, Cal., for Southern California Gas Co.

Barr McClellan, of Clark, Thomas, Harris, Denius & Winters, Austin, Tex., for Aztec Oil & Gas Co.

Thomas G. Johnson and Dan A. Bruce, Houston, Tex., for Shell Oil Co.

Before SETH, McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The Phillips Petroleum Company, together with the several intervenors, all independent producers of natural gas in the Rocky Mountain area, seek review of an order of the Federal Power Commission promulgating a rulemaking procedure for the fixing of rates of natural gas sales in interstate commerce pursuant to the Natural Gas Act, 15 U.S.C. § 717 and, particularly, §§ 4 and 5 of the Act, 15 U.S.C. §§ 717c and 717d, which grants the Commission the authority to establish "just and reasonable rates."

The peculiar aspect of this case is that the Commission has drastically changed the procedure from the traditional method involving trial-type adjudicatory proceedings to this rulemaking method. This is an informal hearing which is not conducted on the record and which does not afford an opportunity for cross-examination. It is used so as to enable the Commission to establish area rates without having an individual hearing on each producer. It calls for composition and reconciliation of written submissions of the various producers. The validity of this procedure is the issue which is presented to us.

I.

HISTORY OF THE CONTROVERSY

The Commission's authority to regulate interstate sales of natural gas derives from the Natural Gas Act of 1938 which declares that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest." 15 U.S.C. § 717(a). The Commission is empowered to set aside and modify any rate or contract which it determines after hearing to be "unjust, unreasonable, unduly discriminatory or preferential."

A brief history of some of the antecedent events is necessary. In 1954 the Supreme Court decided in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), that independent producers of natural gas are natural gas companies within the meaning of § 2(6) of the Act. From this time forward, the Commission has "labored with obvious difficulty to regulate a diverse and growing industry under the terms of an ill-suited statute." In re Permian Basin Area Rate Cases, 390 U.S. 747, 756, 88 S.Ct. 1344, 1354, 20 L.Ed.2d 312 (1968).

Following the Phillips decision, the Commission undertook the regulation of rates of approximately 2,500 producers selling gas in interstate commerce and did so on a company-by-company basis. The result of all this was somewhat ineffectual. See Permian Basin, supra, at 757 n. 13, 88 S.Ct. 1344. Thus in 1960 the Commission undertook to regulate producers on an area basis, whereby a uniform ceiling price applicable to all producers would be established based upon producers' actual costs, area data for the flowing gas costs and national data for new gas-well costs. See Phillips Petroleum Co., 24 FPC 537, 540 (1960), aff'd sub nom. Wisconsin v. FPC, 112 U.S.App.D.C. 369, 303 F.2d 380 (1961), aff'd, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963). The Commission spent five years with its first area rate case which involved the establishing of rates for the Permian Basin.

*See* Permian Basin Area Rate Proceeding, 34 FPC 159 (1965). This case was reviewed by the Supreme Court and the area rate procedure was affirmed. In re Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

As a result of the approval given in the *Permian Basin* case, the Commission instituted a number of other similar proceedings.[1] These proceedings were lengthy and cumbersome, and as a result of this experience the Commission undoubtedly considered some of the admonitions given in the *Permian Basin* opinion which included: the Commission should "continue to examine both the premises of its regulatory methods and the consequences for the industry's future of its rate-making orders;"[2] *Permian* is "the first of many steps toward a more expeditious and effective system of regulation."[3] Based on these statements and the ruling in the *Permian* case, the Commission issued a notice of proposed rulemaking which called for the issuance of rules fixing just and reasonable rates for independent producers in the Appalachian and Illinois Basin Area.[4] In less than a year after its no-

tice rates were prescribed for these areas.[5]

The next step was for the Commission to embark on a nationwide rulemaking proceeding, whereby it sought information on independent producers' costs of exploring and developing natural gas, gas supply, rate of return and general revenue requirements and prices for new gas sales. 35 Fed.Reg. 11638 (1970). Public hearings of record were held and arguments were heard concerning the Commission's attempt to promulgate rates through a rulemaking procedure. *See* 36 Fed.Reg. 13585 (1971). *See also* Order No. 435 which established some rates under § 7 of the Gas Act. This case is currently on appeal, American Public Gas Ass'n v. FPC, D.C.Cir., No. 71–1812.

This led to the issuing of notice of proposed rulemaking and order procedures for the Rocky Mountain area. 36 Fed.Reg. 13621 (1971). This notice provided that just and reasonable rates would be issued for gas contracts dated before October 1, 1968. It provided also for determination as to whether the rates under Order 435 were to apply to contracts dated between October 1, 1968

1. *E. g.*, Southern Louisiana Area Rate Proceeding, 40 FPC 530 (1968), aff'd, 428 F. 2d 407 (5th Cir.), cert. denied sub nom. Municipal Distributors Group v. FPC, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970); Hugoton-Anadarko Area Rate Proceeding, 44 FPC 761 (1970), affirmed, 466 F.2d 974 (9th Cir. 1972); Texas Gulf Coast Area Rate Proceeding, 45 FPC —— (May 6, 1971), appeal pending, D.C.Cir., No. 71–1828; Other Southwest Area Rate Proceeding, 46 FPC —— (October 29, 1971), appeal pending, 5th Cir., No. 72–1114.

2. Permian Basin Area Rate Cases, *supra*, at 816 n. 99, 88 S.Ct. at 1385.

3. *Id.* at 772 n. 37, 88 S.Ct. at 1362.

4. 34 Fed.Reg. 17341 (1969).

5. 44 FPC 1112 (1970). Although several parties challenged the Commission's use of its rulemaking authority to establish rates, the Commission cited American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1969), and stated that no party demonstrated a need for a formal, evidentiary hearing. 44 FPC at 1119. No party appealed the Commission's order. The Commission had further noted that

> our action here is not one based on a nugatory record. We fully considered the staff report, and accepted it as evidence. We received lengthy and well-considered comments from many parties, and answers to said comments made by other parties. And, we considered the staff's minutes of the conference of June 2, 1970, and the comments of such minutes filed by Cities Service on July 24, 1970. Added to our consideration of all of this rather extensive record, we have applied the expertise gained by us in determining previous area rate proceedings, and our long experience gained from dealing with the problems of these areas.

44 FPC at 1119.

and June 17, 1970. Except for these specifics contained in the notice, the rulemaking proceedings in Docket No. R–389A continued in effect. It was thus clear that informal rulemaking was being employed since the order outlined the manner in which data was to be submitted and provided that the Commission's staff would composite and reconcile such data. It named the petitioners herein together with the purchasing pipelines. It allowed other persons to become parties by filing a notice of intention to respond by August 2, 1971.

The petitioners challenged the new rulemaking procedures. These challenges were, however, unsuccessful before the Commission. Motions for rehearing and for reconsideration were made in which the present contentions as to the necessity for evidentiary hearings were made. The Commission rejected the contention that an adjudicatory hearing was required, stating that both the Natural Gas Act and the Administrative Procedure Act recognized the use of rulemaking procedures by notice to interested parties and the opportunity to submit written material.[6]

The Phillips Petroleum Company then filed its petition seeking review in this court. Amerada Hess Corporation on behalf of itself and others filed a petition for review in the Court of Appeals for the District of Columbia. This petition was transferred and consolidated with the Phillips case for the purposes of this review.

The matter submitted for review herein is "Notice Instituting Proposed Rulemaking and Order Prescribing Procedure", which document was, as previously noted, issued by the Commision on July 15, 1971 in Docket No. R–425. This was called by the Commission a rulemaking procedure having the purpose of more quickly effectuating the Commission's task of fixing just and reasonable rates. The Commission ordered:

(1) completion by petitioners and pipelines producing natural gas of questionnaires covering "flowing gas costs and operational data on an individual company 1969 test year basis."

(2) composition of such data by the Commission's staff before October 22, 1971, the results being available to any party on request.

(3) verified written responses to the proposed rulemaking before November 12, 1971.

(4) a conference on August 3, 1971, for "developing the issues and procedures to be followed" in the proceeding, as such "appears to be warranted in the public interest."

No specific rates were set forth in the notice or release.

It is noteworthy that the Commission has initiated the procedure for setting area rates and by doing so it was engaging in a rulemaking proceeding. However, its notice or release also formulated a procedure to be used in the area rate proceeding. This is also a rulemaking proceeding. Thus the question on the merits which we are called on to review is the validity of the proposed procedure of the Commission which in effect abolishes the traditional trial-type hearing and substitutes for it the informal evaluation of written submissions.

---

6. The Commission stated that there was nothing in the Natural Gas Act that required a "hearing on the record" or an adjudicatory hearing. As to the Administrative Procedure Act, the Commission said that even if § 7, 5 U.S.C. § 556, were applicable,

we cannot determine how Amerada has been, or will be, prejudiced by the adoption of the procedures in Docket No. R–425. Amerada has not pointed to specifics on which it needs to cross-examine or present live rebuttal testimony. Instead, Amerada refers to general subjects to which it, and other interested parties have filed written submissions, and states as reasons for its requests, "apparent disputes." . . . The existence of disagreements among the several submissions does not preclude the Commission from making a reasonable determination in light of the record before it and based on its own experience.

## II.

### JURISDICTION TO REVIEW

Petitioners assert that there is jurisdiction pursuant to § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b). The Commission does not deny this, for they are equally desirous of having a determination of the validity of the proposed procedure. Hence, the Commission takes the position that the orders entered are final and that the attempted review is not a premature effort. This court is obligated, however, to view the condition and determine for itself that there is jurisdiction to determine the case. See Sunray DX Oil Co. v. FPC, 351 F.2d 395, 397 (10th Cir. 1965).

In the proposed rulemaking procedure, specific rates, terms or conditions are not set forth. It is a rule which prescribes standards for the setting of area rates in the Rocky Mountain region and to that end it orders submission of certain data. Thus it is clear that the Commission is presently engaged in an exercise of its rulemaking power, even though it is merely formulating the procedure to be used.

The matter before us is a question of law and not of fact. However, it is procedural in its nature, even though it may have profound substantive effects, and we are mindful that mere procedural orders have been held to be not within the scope of the circuit courts of appeal. See FPC v. Metropolitan Edison Co., 304 U.S. 375, 385, 58 S.Ct. 963, 82 L.Ed. 1408 (1938). But this line of cases goes to the proposition that courts will not interfere with the administrative process and will limit themselves to review of an actual order following a hearing. See FPC v. Metropolitan Edison Co., supra; Amerada Petroleum Corp. v. FPC, 285 F.2d 737 (10th Cir. 1960); United Gas Pipe Line Co. v. FPC, 206 F.2d 842 (3d Cir. 1953); Eastern Utilities Associates v. SEC, 162 F.2d 385 (1st Cir. 1947). If the order is as bad as the petitioners claim, it would require a holding that there exists a denial of rights guaranteed by the due process clause of the Fifth Amendment and a holding also that the Commission is acting beyond the law and outside the Administrative Procedure Act as well. Violations of this magnitude would render the entire proceeding invalid, and it could be raised following the setting of rates, but there would be much wasted motion in proceeding in this manner.

The statute in question, § 19(b), provides for judicial review of final agency orders and under such a statute challenges to newly promulgated agency regulations prior to their application against particular individuals have often been entertained. See FCC v. ABC, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954); Columbia Broadcasting System v. United States, 316 U.S. 407, 425, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L. Ed.2d 681 (1967). In the latter three cases Mr. Justice Harlan, writing for the Court, mentioned two applicable criteria: first, whether the issues tendered are appropriate for judicial resolution, that is to say e. g., whether specific facts were needed in order to decide the case and, secondly, whether the impact on the parties is substantial. In one of the food, drug and cosmetic act cases, Toilet Goods Ass'n v. Gardner, supra, it was determined that a question existed as to whether the threatened inspection would ever materialize. In the other two cases, Abbott Laboratories v. Gardner, supra, and Gardner v. Toilet Goods Ass'n, supra, it was held that a pre-enforcement judicial review was justified because the questions were straightforward legal ones not depending on specific facts and, secondly, that the regulations had an immediate substantial impact on the manufacturers involving large expenditures and the risk of serious penalties.

In our case the petitioners present a clear-cut legal issue, alleged deprivation of procedural due process, and it could not be made any clearer by factual background. Furthermore, the impact is immediate and the cost of its application, if it proves to be invalid, is substantial. The delay which would result from remanding this case for full-scale procedure would be great and unquestionably injury would result to the petitioners and would be felt by the public at large. The words of Chief Justice Stone in Columbia Broadcasting System v. United States, 316 U.S. 407, 425, 62 S.Ct. 1194, 1204, 86 L.Ed. 1563 (1942), come to mind:

> The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control.

Accordingly, we view the present order as one which is appropriate for judicial review and resolution since it tenders a pure question of law and, secondly, the hardship to the petitioners which would result from refusal to review the question would be of great magnitude, and we conclude that the case is a proper one for the exercise of this court's jurisdiction.

### III.

### VALIDITY OF THE PROPOSED REGULATION BY RULEMAKING UNDER THE NATURAL GAS ACT

The Act does not expressly authorize the procedure which the Commission has adopted; by the same token, the Act does not prohibit it. Section 5 of the Act gives the Commission the power to fix just and reasonable rates. It does require that a hearing shall be held, and the rules of procedure regarding hearings are found in § 15 of the Act, 15 U.S.C. § 717n. Part (b) of this particular section provides that

> [a]ll *hearings*, investigations, and proceedings . . . *shall be governed by rules* of practice and procedure to be *adopted by the Commission,* and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter. (Emphasis added.)

The Commission, acting pursuant to § 16 of the Act, 15 U.S.C. § 717o, issued a rule which provides, as we have seen, for an informal hearing. This would appear to be in conformity with the plain terms of § 15 quoted above.

Section 16 is entirely consistent with the particular order adopted. It provides the Commission with the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate. This provision goes on to say, referring to the Commission, that it "may prescribe the form or forms of all statements, declarations, applications, and reports to be filed." This section thus provides the Commission with a broad authority in prescribing procedures for obtaining information upon which it is to act. As was said by the Court of Appeals for the District of Columbia, a primary objective is the obtaining of information to enable the Commission to carry out effectively the provisions of the Natural Gas Act. The court went on to say that the Commission has the ability to choose with relative freedom the procedure that it will use to acquire relevant information. The Commission has the power to tailor its proceedings so as to fit the issues before it together with the information that it needs to illuminate those issues and the manner of presentation which will bring before it the

information in the most efficient manner. *See* City of Chicago v. F.P.C., 147 U.S.App.D.C. 312, 458 F.2d 731, 743–744 (1971).

■ After reading §§ 15 and 16, one is constrained to conclude that the Commission has a very broad discretion indeed in determining the form of its proceedings. The petitioners, on the other hand, maintain that § 5 of the Act in providing for a hearing, necessarily means a formal or adjudicative type of hearing with full right of cross-examination and participation in the preparation of a public record, a record which must be the product of the ratemaking procedure. This, so it is argued, is the method which has been followed throughout the years and the present attempts at innovations are not authorized by the statute.

It is true that the Commission has traditionally conducted individual company-by-company hearings. *See, e. g.,* FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942), which upheld the procedures under the Natural Gas Act and endorsed the adjudicative formal-type hearing. However, the Court in that instance did not consider the nature of the proceedings required under the law. It merely stated that a prerequisite to a rate order is a hearing and findings. In that case the companies had full opportunity to cross-examine witnesses and although the Supreme Court approved the proceeding as a fair hearing, it did not es-

tablish that a formal hearing is necessary in order to comply with the Gas Act or the Constitution.

The petitioners also rely on other regulatory statutes and seek to argue that in order to have a fair hearing it must be a formal proceeding.[7] However, we cannot justifiably apply standards which have been laid down in quasi-judicial proceedings.

Decisions of the Supreme Court since the rulings in the *Phillips* cases have pointed the way to adoption of a more flexible and less formal method for fixing the rates of gas producers. Its first effort was area rate setting, itself a departure from the adjudication process. The Supreme Court approved this early effort in FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed. 112 (1964), a pre-*Permian Basin* case. The Court, though dealing with § 7 of the Gas Act, held that

> the statutory requirement for a hearing under § 7 does not preclude the Commission from particularizing statutory standards through the rulemaking process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived. . . . To require the Commission to proceed only on a case-by-case basis would require it, so long as its policy outlawed indefinite price-changing provisions, to repeat in hearing after hearing its conclusions that condemn all of them. . . .

---

7. Petitioners place reliance on Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) and its successor, Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129 (1938). There the Supreme Court reversed a decision establishing rates under section 310 of the Packers & Stockyards Act of 1921, 7 U.S.C. § 211, because the administrative official making the decision did not hear the evidence, 298 U.S. at 478–479, 481–482, 56 S.Ct. 906, a situation not occurring in the case at bar. Moreover, the *Morgan* proceeding was characterized as quasi-judicial, 304 U.S. at 14, 58 S.Ct.

999, whereas area rate proceedings are quasi-legislative. Finally, it was stated that "full hearing" embraced the right to present evidence and the opportunity to know the claims of opposing parties. *Id.* at 18–21, 58 S.Ct. 999. Petitioners had this right and opportunity.

Petitioners also misplace reliance on I.C.C. v. Louisville & Nashville R.R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913). Not only does that case deal with the Interstate Commerce Act, but it is also a pre-Administrative Procedure Act case which is fully out of harmony with that statute.

We see no reason why under this statutory scheme the processes of regulation need be so prolonged and so crippled.[8]

The decision of the Supreme Court which we regard as dispositive of the issues raised here is In re Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). In that area rate decision Mr. Justice Harlan, writing for the Court, described in detail the difficulties experienced by the Commission in seeking to regulate the producers' sales. It was described as the "outstanding example in the federal government of the breakdown of the administrative process," citing Landis, Report on Regulatory Agencies to the President-Elect.

In the *Permian Basin* case the Supreme Court, utilizing the price regulation analogy, stated that the Constitution does not prohibit the determination of rates through group or class proceedings and that it does not require that the separate financial position of each member of the class be evaluated. Indeed, the only limitation noted was that the prices fixed must be calculated in conformity with the constitutional limitations; that such prices must not be arbitrary, discriminatory or irrelevant to the policy which the legislature had agreed to adopt.

As we view it, the present effort is, to a large degree, the result of the encouragement which the Supreme Court gave to the FPC to innovate. Thus in the *Permian* case the Court stated that "the breadth and complexity of the Commission's responsibilities demand that it be given every reasonable opportunity to formulate methods of regulation appropriate for the solution of its intensely practical difficulties."[9] This message was many times repeated: "the width of administrative authority must be mea-sured in part by the purpose for which it was conferred";[10] "the ultimate achievement of the Commission's regulatory purposes may easily depend upon the contrivance of more expeditious administrative methods";[11] "administrative authorities must be permitted, consistently with the obligations of due process, to adapt their rules and policies to the demands of changing circumstances";[12] "[p]rovided only that they do not together produce arbitrary or unreasonable consequences, the Commission may employ any 'formula or combination of formulas' it wishes, and is free 'to make the pragmatic adjustments which may be called for by particular circumstances.'"[13]

■ The final contention of the petitioners is that there can be a valid judicial review only if there is a record. However, we do not agree that this requires that there be a record resulting from a formal evidentiary hearing. The important point is that there shall be a record which will allow an orderly review of the Commission's findings and conclusions. Under the rule the record will consist of the written comments submitted by the respondents to the Commission together with questionnaire data filed by producer and pipeline companies and composited by the Commission staff. The submissions of the petitioners would be placed in public files and made available for public inspection. Thus the petitioners are aware of the material which will be considered together with the application of Commission expertise to the information submitted.

Finally, the reviewing court is at liberty to remand the cause to the agency for further delineation, information or expression of views.

■ In the light of the provisions of the Act, together with the Supreme

---

8. FPC v. Texaco, Inc., *supra*, 377 U.S. at 39, 44, 84 S.Ct. at 1109, 1112. *See* Davis, Administrative Law Treatise § 7.01, at 153–54.

9. 390 U.S. at 790, 88 S.Ct. at 1372.

10. *Id.* at 776, 88 S.Ct. at 1364.

11. *Id.* at 777, 88 S.Ct. at 1365.

12. *Id.* at 784, 88 S.Ct. at 1369.

13. *Id.* at 800, 88 S.Ct. at 1377.

Court's comments concerning the need for streamlined procedures, we are of the opinion that the proposed rulemaking is consistent with the Natural Gas Act and is valid.

## IV.

### THE CONTENTION THAT THE ADMINISTRATIVE PROCEDURE ACT REQUIRES FORMAL PROCEEDINGS

Petitioners read the Administrative Procedure Act (APA) as requiring a formal hearing whenever a hearing is called for in a particular type of proceeding. The Commission, on the other hand, contends that the key to the requirement of a formal hearing is the term "hearing on the record." [14]

■ The APA expressly provides for two categories of administrative hearing and decision: rulemaking and adjudication. The term "rule" in § 2, 5 U.S.C. § 551(4), includes the approval or prescription of future rates. Unquestionably, therefore, the hearing required by the Gas Act fixing rates is a rulemaking procedure rather than adjudication.

Two types of rulemaking are recognized under § 4. Informal is that generally used, and § 4 prescribes the procedure in connection with informal rulemaking such as proper notice so that interested persons are given an opportunity to participate "through submission of written data, views, or arguments with or without oral presentation"; the rules adopted must incorporate a statement as to their basis and purpose. Formal rulemaking is the exception which is set forth in § 4(b) which provides:

When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

The § 4(b) exception calls for the procedural formalities that are found in adjudication including the right to submit oral evidence and to cross-examine. This approach is a hybrid one which is in part rulemaking and in part adjudication.

■ The fact, as previously noted, that the Gas Act does not contain the words "on the record" furnishes a strong argument in support of the Commission's contention that informal rulemaking satisfies the requirements of the APA. If the words "on the record" were contained in the Gas Act, it would furnish a basis for the petitioner's position. See 2 Davis, Administrative Law Treatise § 13.08, at 225 (1958). Professor Davis states that the large number of administrative statutes do not contain the words "hearing on the record." However, there are indications that the presence or absence of these words is not conclusive. See H.R.Rep.No. 1980, 79th Cong., 2d Sess. 51, n. 9 (1946); Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950). A more reliable test is the congressional intent as contained in the specific statute. See United States v. Allegheny-Ludlum Steel Co., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

The scope and depth of the § 4(b) exception are not apparent from a reading of the Committee reports and the debates. Moreover, a study of the research materials such as the Final Report of the Attorney General's Committee, the Committee Monograph on the FPC and the Attorney General's Manual on the Administrative Procedure Act do not, with the exception of the Attorney General's Manual, contain any significant evidence which would indicate a congressional intent to require formal rulemaking procedures.

Comments in the Attorney General's Manual at page 33 take for granted that rate setting hearings under the Gas Act will be on the record and thus will be

14. They cite in support of their argument the following cases: United States v. Allegheny-Ludlum Steel Co., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); Siegel v. AEC, 130 U.S.App.D.C. 307, 400 F.2d 778, 785 (1968); Pacific Coast European Conference v. United States, 350 F.2d 197, 205 (9th Cir. 1965).

formal and adjudicative. These comments are, however, not to be regarded as evidencing congressional intent because the Manual is not addressed to Congress but rather to various administrative agencies after the passage of the Administrative Procedure Act, and so this is at best very weak support for the petitioners' contentions.[15]

■ Accordingly, from the legislative history of the Administrative Procedure Act, it must be concluded that Congress intended to allow administrative agencies a broad latitude in adopting rulemaking procedures. Throughout this period the FPC had been conducting experiments with various procedures, especially in the area of proof and evidence, and the Attorney General's Committee recommended further experimenting. Congress sanctioned such procedural experimentation in the APA.

As we have seen the present proposed rulemaking stems from the suggestions of the Supreme Court in the *Permian Basin* case. There is no assurance, however, that this will be successful and the procedures may have to be modified or discontinued. But such flexibility was within the contemplation of the Congress when it enacted the APA, especially, where as here, formal rulemaking procedures are not required.

■ Finally, as we have noted earlier, the hearings here involve quasi-legislative rather than quasi-judicial activities. Where this is the situation, informal proceedings are generally held to be sufficient. *See* Norwegian Nitrogen Prod. Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933); I. C. C. v. Louisville & Nashville R. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913) (dictum).

■ In summary, we are of the opinion that the proposed rulemaking is in harmony with the comments of the Supreme Court contained in *Permian Basin* and in harmony also with the Natural Gas Act and the APA. The gas producers' contrary argument is largely based on the FPC's history of conducting adjudicatory hearings. Based on this history, the gas producers would seek to have the court impose a requirement that its hearings be conducted in this manner. We are convinced that such action would be unwarranted.

The petition for review should be and the same is hereby denied.

SETH, Circuit Judge (dissenting):

I must dissent from the majority opinion filed herein as to the procedure required to be followed by the Federal Power Commission. It does not appear that the issue has been settled by the Permian Basin Area Rate Case, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, as the opinion states. Also the specific method here sought to be used by the FPC as evidenced by its rulings and orders in this record has not been considered in reference to the doctrine of confiscation which provides the constitutional base for court review of proceedings of this nature. The specifics of rate-making include the resolution of disputed facts and a consideration of the constitutional problems attendant to the fixing of just and reasonable rates.

The issue is the method of setting rates for the gas producers, and although the Supreme Court has indicated that some substantial departures from traditional methods are permitted, the complete conversion to rulemaking under the orders here concerned does not ap-

---

15. The interpretation of § 4(b) contained in the Manual conflicts to some degree with the position taken by the Attorney General's office prior to passage of the APA. The Attorney General's Committee specifically found in its Monograph on the Federal Power Commission that formal rulemaking had proved unsatisfac-

tory for rate setting and was not likely to be used in the future. Sen.Doc.No.10, 77th Cong., 1st Sess. pt. 12, at 40 (1941). The Final Report of the Attorney General's Committee also suggests that rate setting will not be restricted to formal, adjudicatory proceedings. Sen.Doc.No.8, 77th Cong., 1st Sess. 106–11 (1941).

pear warranted under existing decisions. I am not prepared to anticipate a further departure in view of the constitutional limitations.

Some further examination of the decisions appears to be necessary before considering some practical problems of the record, the required review by the courts, and some specific matters relative to the method here sought to be used by the FPC.

In F. P. C. v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, the Court considered the ratemaking function of the FPC under section 5 of the Natural Gas Act. The Commission then was proceeding under the typical return on "investment" ratemaking doctrines. However, the Court described at some length the function of the courts and the nature of judicial review under the Natural Gas Act, and stated: "Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped." It is this determination by the courts that is frustrated by the procedure here adopted by the FPC.

The Supreme Court, prior to F. P. C. v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, had decided Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (see also 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129). One of the principal issues there raised and considered by the Court was the nature of the hearing required to be held under the Packers and Stockyards Act [7 U.S.C. §§ 181–229]. The Court there held it was quasi-judicial and that a "full hearing" was required and said: "Nothing can be treated as evidence which is not introduced as such. . . . Facts and circumstances must not be considered which should not legally influence the conclusion. Findings based on the evidence must embrace the basic facts which are needed to sustain the order." This is a clear and direct reference to the procedure and to nothing else.

There have been several decisions by the United States Courts of Appeals which directly concerned summary proceedings under the Natural Gas Act. Some of these are based on the Act and some on due process. One of the earlier of these cases is Mississippi River Fuel Corp. v. F. P. C., 202 F.2d 899 (3d Cir.), where the court did not permit a summary refusal by the FPC to receive a rate schedule tendered under section 4. Later in Shell Oil Co. v. F. P. C., 334 F. 2d 1002 (3d Cir.), the same court held that those objecting to filings under section 4 should have an opportunity to be heard and there be a "full hearing." See also Hill v. F. P. C., 335 F.2d 355 (5th Cir.). In Murphy Oil Corp. v. F. P. C., 431 F.2d 805 (8th Cir.), the court considered FPC action on a rate application without a hearing. The Commission had sought to handle the issue under section 16 of the Natural Gas Act, but the court held that a "hearing" was required, which was understood to mean a formal hearing. The court in American Louisiana Pipe Line Co. v. F. P. C., 120 U.S.App.D.C. 140, 344 F.2d 525, held an evidentiary record was required with a decision based upon the facts so developed and not upon the regulatory experience of the agency.

F. P. C. v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, must be regarded as a significant case as to the issues before us. It is apparent that the nature of the proof required and the method of the Commission is now much different in the area rate cases such as the Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, but this should not bring about a different result as to the fundamental nature of the hearings. The practices of the Commission have changed during the many years it has been in existence, but a present feeling of urgency, as indicated in the Commission's brief, should not overcome the statutory or constitutional requirements for a full hearing.

The FPC here relies on Hunt Oil Co. v. F. P. C., 424 F.2d 982 (5th Cir.), which is important, but is cited principally for the statement in it that area rate proceedings are quasi-legislative and thus not quasi-judicial. This is useful as a generality, but it does not assist us much in our problem.

The relation of the Administrative Procedure Act to the Natural Gas Act provisions has been elsewhere considered in detail and need not be repeated here other than to state the conclusion that even if the Natural Gas Act does not expressly require a full evidentiary hearing, it does require a "hearing on the record," and thus if the Administrative Procedure Act is operative, a hearing to meet its requirements set out in 5 U.S.C. §§ 556 and 557 is necessary.

On the requirements of the Administrative Procedure Act as to rulemaking by the ICC, the Supreme Court has recently decided United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453. This treats the application of 5 U.S.C. §§ 556 and 557 (the APA) when *rules* are required to be "on the record." The Court there said:

"Because the proceedings under review were an exercise of legislative rulemaking power rather than adjudicatory hearings as in Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S. Ct. 445, 94 L.Ed. 616 (1950), and Ohio Bell Telephone Co. v. Public Utilities Comm'n, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); and because 49 U.S.C. § 1(14)(a) does not require a determination 'on the record' the provisions of 5 U.S.C. §§ 556, 557, were inapplicable."

The above decision is significant here, but as the quotation indicates the Esch Act gives specifically to the ICC the authority to make "rules, regulations, and practices with respect to car service." With this specific authority for rules for the limited subject before it in an Act which applies only to the ICC and its powers, it is not difficult to see how

authority was found for the rulemaking type of hearing under the APA without use of sections 556 and 557.

The Supreme Court then in United States v. Florida East Coast Ry., 410 U. S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223, considered essentially the same issue as in United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L. Ed.2d 453. Again it is a matter arising under the Esch Act with its limited scope of car service rules and with specific authority for rules relating to the subject. The Court there holds that evidentiary hearings are not required under the Esch Act with reference to the imposition of charges on carriers using cars of others. It also holds that the term, "hearing," in section 1(14)(a) of the Interstate Commerce Act is not the equivalent to "on the record after opportunity for an agency hearing," as used in section 553(c) of the Administrative Procedure Act. The Court also notes however that sections 556 and 557 of the APA could be "triggered" by other language. The opinion in Florida East Coast is in the narrow statutory area of "car rules," but makes a general distinction between "rulemaking type proceedings" and "a proceeding devoted to the adjudication of particular disputed facts." The Court distinguishes the Morgan case on the basis of notice to the parties. Attention is also directed in Florida East Coast to the distinction in Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372, between disputed facts and general rules.

It would appear also that the hearing provisions in the Federal Power Act plus the contemplated review should "trigger" the provisions of sections 556 and 557 of the Administrative Procedure Act, and the exceptions in section 553 apply because this is certainly not a matter of general policy rules. We have before us an example of the need to resolve disputed facts under the distinction made in Florida East Coast in a traditional ratemaking situation. The Commission has expressly here stated in

its Order of December 16, 1971, that it would decide these disputed facts "in the light of the record before it and based on its own experience." The decision is thus to be made on these two factors even without the benefit of an evidentiary hearing. Although Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288, may be weakened by the way in which it was distinguished in Florida East Coast, it still must stand for the proposition in the following quotation from the opinion relative to the reasons for an evidentiary hearing:

".  .  . The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. The 'hearing' is the hearing of evidence and argument. If the one who determines the facts which underlie the order has not considered evidence or argument, it is manifest that the hearing has not been given."

See also I. C. C. v. Louisville & Nashville R. R., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431.

By order of the FPC which instituted the rulemaking procedure, certain producers were named therein and made parties whether they wanted to be or not. Furthermore, they were "ordered and directed" to complete, "verify," and file certain cost data within a specified time. The proceedings were directed to them specifically. Statements and "submittals" were required to be under oath. This procedure has to be unusual in a rulemaking proceeding where generally those interested may submit information if they wish. However, as to those named they are "hereby made respondents to this rulemaking proceeding," and then ordered to respond. Thus it commences with all the compulsion used at any ratemaking hearing, but then provides for "submittals" and "responses" and "statements" which the staff "shall composite and reconcile." After this, the Commission will "consider" the material and reach a decision, but from the record and brief references it also expects to rely on its "expertise" and the files which have been accumulated from the nationwide "hearings" previously conducted and from other sources. As indicated the FPC in its Order Denying Motion for Cross-Examination in Docket R–425, issued December 16, 1971, said:

"In a rulemaking proceeding, such as the instant one, our primary objective is the acquisition of information which will enable us, inter alia, to determine just and reasonable producer rates for jurisdictional sales in the Rocky Mountain area for contracts dated prior to October 1, 1968. The purpose is not to allow interested parties to define the issues or narrow the scope of the proceedings. On the contrary, in soliciting comments from interested parties, and in relying upon the experience gained through previous area rate proceedings, we are building a record from which we can make a determination of said producer rates. We need not, as Amerada would require us to do, lose ourselves in an excursion into detail which would obscure, rather than clarify, the issues before us."

The above quotation in the first sentence states that only one of the purposes of the hearing is to determine just and reasonable rates. If this is only one of the purposes and since "comments" are also "solicited" from other interested parties, and experience from other hearings is used, it is difficult to determine what "the record" of the "hearing" will be. It is also apparent that those ordered to be made parties will have no part in the making of the record of the proceedings, that is, through the introduction of exhibits or testimony with the right to object to or test the validity of the material. There is thus assembled material which cannot be considered a "public record," and which is not really identifiable as having been assembled during the course of public proceedings.

In a matter related to the record, the petitioners raise the issue as to how there can be judicial review of the determination to be made by the FPC in this rulemaking proceeding. The statute expressly provides for review and the preparation of a record. Review is also required on constitutional grounds under the confiscation doctrine. The hearings must thus be held in contemplation of this review, and the record so developed must be suitable for the purpose. Also for a meaningful review the courts must know the basis for the decision by the administrative body. Thus the requirement for findings, and of equal importance the decision must be based on "the record." It must be not only based on "the record" but the agency must consider *only* the record as the basis for its decision. See Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372, and the quotation from Morgan above. A decision cannot be properly reviewed if it is based on matters outside the record. These requirements all relate to the constitutional confiscation doctrine prevailing in all ratefixing proceedings.

In the proceedings here contemplated only the staff members or the Commission know what material has been submitted. The parties have no knowledge as to what will be considered as part of the record and have no part in the development of the record as such during the course of the proceedings. This applies both to the record for decisional purposes and for review.

Further, with reference to the record for decision, the Commission has not stated that its determination will be based on the record alone, but has stated that it will "consider" the material submitted by the parties. It has also said it will use its experience to resolve disputed facts. Thus the problem relates to the decisional process, the matter of review, and the preparation of a "public" record. The general method of submitting all material in writing and having the Commission staff "composite and reconcile" such data leads to a question as to whether or not the procedure is really a "hearing." Under the Act, the Commission must determine whether rates are just and reasonable and the Act provides that if the rates are not "reasonable," they are "unlawful." It is apparent from the orders entered by the Commission and from the Commission's brief that it intends to rely on much more than the submittals and responses filed by the parties in its proceedings. In the Commission's order of December 16, 1971, denying the motion for cross-examination, the Commission stated that it was "soliciting comments" and "in relying upon the experience gained through previous area rate proceedings, we will build a record upon which we can make a determination of said producers' rates." The Commission further states that the rulemaking method was chosen because of "the advantages of determining rates in a more expeditious manner, based on the informed judgment and expertise of the Commission through ten years of producer regulation," etc.

The matter of cross-examination was also raised by the petitioners and expressly ruled upon by the Commission. It stated that there was no such procedure contemplated in rulemaking proceedings, and if there was it was "permissive" and could be denied entirely (as distinct from being limited).

Cross-examination in the situation here considered has several well recognized purposes, all of which relate to the matter of a fair hearing and the traditional "hearing" in judicial and administrative proceedings. The first purpose of cross-examination usually considered is to test the accuracy of the matters or facts presented by a party. This purpose needs no further description.

Another purpose of significance here is to test the knowledge of the witness as to the matters whereof he speaks; thus to show whether or not he is qualified or has the knowledge to so speak and thus to permit an evaluation of his testimony. The order of the Commission which sets out the procedure re-

quired the "submittals" to be under oath acknowledged in a certain way. This acknowledgment required the person to swear that ". . . he has examined the statements contained in the submittal or response, and that all such statements are true and correct to the best of his knowledge, information, and belief." It is apparent that there is no way of telling. the extent of such person's knowledge or information from his signature or title. There is no requirement as to the qualifications of the persons signing the submittals. Thus there is no way of testing whether the person knows whereof he speaks. The Commission does not know and the parties do not know.

Another purpose served by cross-examination is to develop the rest of a story partly told. The things which are omitted upon the direct examination are usually the most interesting and most revealing. Again with ex parte "submittals" the omitted details, when no further examination is expected, can be significant. Who better knows these things than the parties in the same or a related business?

As to bare conflicts in the facts which may result from the "submittals," the Commission says in its Order Denying Cross-Examination of December 16, 1971, that: "The existence of disagreements among the several submissions does not preclude the Commission from making a reasonable determination in light of the record before it and based on its own experience." Ratemaking after all deals with specifics, not generalities, as it can be the confiscation of the property of the regulated parties, and at the least constitutes a statutory imposition of restrictions on their earnings not so imposed on businesses in other fields.

In my opinion the proceeding here concerned is well within ratemaking. It

is to resolve disputed facts, to determine rates retroactively to some extent, and to decide whether within the constitutional justification for court review the rates are just and reasonable or whether they are "unlawful." This cannot properly be done by resorting to rulemaking powers, and deciding the facts on the basis of "submittals" by anyone and which cannot be tested for accuracy or completeness, and which in turn the Commission staff will "composite and reconcile," whatever that may be. The Commission will then "consider" the submittals and whatever else is in their files and in their "experience." This may then be reviewed by the court.

This method does not appear to be within the proper construction of the Federal Power Act nor the Administrative Procedure Act, much less in accord with the established standards for a constitutional test on the confiscation issue. We must consider what the Commission has said it is going to do in its orders, what it is going to consider and how. This is the specific procedure before us, and the issues must be so evaluated.

The Commission has argued that there is a matter of urgency in view of an impending shortage of natural gas and abbreviated hearings are necessary. Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, was decided in 1954 and the Act itself was passed in 1938. The area rate method was announced by the FPC in 1960. Congress has set up the regulatory machinery, and decided on the fact of regulation. We should act within this framework, and requests for substantial variations should be directed to Congress.

The orders relative to the nature of the hearing should be set aside and the matter remanded to the Commission.